J-A26033-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 773 MDA 2017 |
| KEVIN SCOTT BOWER, JR. | : | |

Appeal from the Order Entered April 28, 2017
In the Court of Common Pleas of Clinton County Criminal Division at
No(s):  CP-18-CR-0000536-2015

BEFORE:   BOWES, J., OLSON, J., and RANSOM, J.

CONCURRING MEMORANDUM BY OLSON, J.:          **FILED APRIL 16, 2018**

I agree with the learned Majority that the trial court did not err in denying the Commonwealth of Pennsylvania's motion to admit evidence of prior bad acts committed by Appellee pursuant to Pa.R.E. 404(b).  I write separately, however, to explain the basis for my view that the trial court acted properly and to address some of the points raised by the learned Dissent.

I begin by emphasizing that our standard of review requires a finding that the trial court abused its discretion in denying the Commonwealth's motion.  ***Commonwealth v. Hicks***, 156 A.3d 1114, 1125 (Pa. 2017) ("Admissibility of evidence is within the sound discretion of the trial court and we will not disturb an evidentiary ruling absent an abuse of that discretion.")  Most importantly, "an abuse of discretion may not be found merely because the appellate court might have reached a different conclusion."

*Commonwealth v. Williams*, 91 A.3d 240, 248-249 (Pa. Super. 2014), *quoting* **Commonwealth v. Garcia**, 661 A.2d 1388, 1394-1395 (Pa. Super. 1995). Here, the trial court heard argument on this matter and made a decision that is supported by the evidence of record. Thus, even though another jurist might reach a different conclusion after looking at the facts of record, I cannot conclude that the trial court abused its discretion in denying the Commonwealth's motion.

It is well established that "evidence of prior bad acts, while generally not admissible to prove bad character or criminal propensity, is admissible when proffered for some other relevant purpose so long as the probative value outweighs the prejudicial effect." **Hicks**, 156 A.3d at 1125, *quoting* **Commonwealth v. Boczkowski**, 846 A.2d 75, 88 (Pa. 2004). Our Supreme Court "has long recognized an exception to the general inadmissibility of other crimes evidence where there is a striking similarity – or logical connection – between the proffered bad acts and the underlying charged crime." **Hicks**, 156 A.3d at 1125. In further explaining the logical connection standard, the Pennsylvania Supreme Court has noted, "much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be **so unusual or distinctive as to be like a signature**." **Id.** at 1125-1126, *quoting* **Commonwealth v. Rush**, 646 A.2d 557, 560-61 (Pa. 1994) (emphasis added). Thus, to prove a common scheme, as the Commonwealth asserts is present in this case, the crimes must have striking similarities that establish a logical connection

sufficient to present a "virtual signature." **Hicks**, 156 A.3d at 1128. It is not enough for the Commonwealth to present "insignificant details of crimes of the same class, where there is nothing distinctive to separate them from, for example, common street crimes." **Id.**

In looking carefully at the record before us, I must conclude that, although the crime of indecent assault to which Appellee pled guilty in 2009 shares some common details with the crimes for which Appellee was charged in the case *sub judice*, these similarities are not sufficient to establish a "virtual signature." Instead, the events merely involve crimes of the same general class; *i.e.*, indecent assault. In fact, I believe that the facts surrounding the two incidents at issue are sufficiently dissimilar so as to prevent any finding of a "virtual signature."

Appellee pled guilty to the crime of indecent assault in 2009; however, the certified record in this case does not contain a copy of the transcript of the plea colloquy. Instead, the only statement of the facts is contained in the criminal complaint filed on May 26, 2009.[1] **See** Appellee's Memorandum in Opposition to Commonwealth's Rule 404(b) Motion, Exhibit 1. The criminal complaint sets forth the following relevant facts:

> [J.G.] stated that an ex-boyfriend of hers, [Appellee], had forced
> her to have sexual intercourse with him in her bedroom after she
> had allowed [Appellee] to stay at her residence after an evening

---

[1] Counsel for the Commonwealth indicated during argument on its Rule 404(b) motion that J.G., the victim in the 2009 assault, died of a drug overdose. Therefore, she would not be available to testify at the trial in this case. N.T., 4/24/17, at 8.

out at Angelo's Bar in Lock Haven. [J.G.] stated that as they were lying in bed and she attempted to go to sleep, [Appellee] began rubbing her back, arms and legs and fondling her and telling [J.G.], "you know you want it." Eventually, [Appellee] said that he wanted to have sex with [J.G.] and rolled her over onto her side, pinned her arms down and began to pull down her sweat pants. [J.G.] stated that [Appellee] tried for some time before getting her pants down as she yelled and screamed at [Appellee] to stop. [Appellee] kept telling [J.G.], "you know you want it", and, eventually, [Appellee] was able to pull [J.G.'s] underwear off, at which point, while still holding [J.G.] down by holding her arms and hands and lying on top of her, [Appellee] was able to eventually penetrate [J.G.'s] vagina with his penis. [J.G.] stated that [Appellee] actually put one hand around [J.G.'s] neck after shoving her to the top of the bed with her head between the headboard and the mattress and held her there until [Appellee] was finished and ejaculated inside of [J.G.].

*Id.* The criminal complaint goes on to state:

[Appellee] stated that at first the sex was consensual in [J.G.'s] bed; however, as he and [J.G.] were having sexual intercourse, [J.G.] told [Appellee] "no" and wanted [Appellee] to stop. [Appellee] stated that he told [J.G.] to let him finish and then he would leave [J.G.'s] house.

*Id.* Thus, in the 2009 incident, Appellee went to a bar with J.G., an ex-girlfriend. Later, J.G. invited Appellee to stay at her residence and allowed him into her bed. J.G. wanted to go to sleep; however, Appellee made sexual advances by rubbing J.G.'s back, arms and legs. Appellee then told J.G. that he wanted to have sex at which time he rolled her over in bed, got on top of her and pinned down her arms. J.G. screamed at Appellee and told him to stop; however, he continued to remove her sweat pants and underpants and then he had sexual intercourse with her. He grabbed her around the neck and shoved her head up against the headboard until he was done. While being

- 4 -

interviewed by the police, Appellee stated that the sex, at first, was consensual; however, as they progressed, J.G. told him to stop. Appellee asked J.G. to let him finish and then he would leave her house.

In the instant case, N.D. knew Appellee for approximately six months. They did not have much contact during that six months – they "had hung out" at a friend's house and N.D. had given Appellee a ride in the past. N.T., 12/22/15, at 27. They did not date. *Id.* On the evening of August 9, 2015, N.D. was back in town and, therefore, went out with some friends, including Appellant. They started the evening at a bar called Hangar 9. *Id.* at 7-8. At Hangar 9, N.D. had approximately 3 1/3 beers and a possibly a shot. *Id.* at 9, 28. Appellee bought a beer for her that "tasted a little funny". *Id.* at 9. N.D. consumed the funny tasting beer. When Appellee bought her another beer, N.D. said that it did not taste right; therefore, she asked one of her other friends to try it. *Id.* at 9-10. The friend agreed that it did not taste right and the bartender poured her a new beer that tasted fine. *Id.* at 10.

N.D., Appellee and the friends then went to the American Legion where N.D. drank more. *Id.* at 10-11. At the American Legion, Appellee took N.D.'s car keys and he drove N.D. from the American Legion to the Shamrock bar where N.D. had one or two more beers. *Id.* at 11-13. From there, the group went to the Valley Hotel. *Id.* at 13. Appellee again drove N.D. in N.D.'s car. *Id.* at 14. At the Valley Hotel, N.D. drank only ½ of a beer and then stopped

because she did not feel right. *Id.* at 14. N.D. testified that it was at this time that "things kind of get fuzzy." *Id.*

When Appellee and N.D. left the Valley Hotel, N.D. thought that Appellee was taking her to her brother's house. *Id.* at 15. Instead, Appellee drove to a park behind a Walmart. *Id.* at 16. Appellee crawled over on top of N.D. who was sitting in the front passenger seat. N.D. told him this was something that she did not want to do. Appellee asked her if she wanted him to stop and she said "yes"; however, he continued to remove one of her pant legs and underwear legs. *Id.* at 16, 19. N.D. could not recall if Appellee took his pants off or whether he just opened them. *Id.* at 19. Appellee then penetrated N.D.'s vagina with his penis and N.D. believed that Appellee ejaculated. *Id.* at 19-20. N.D. stated that she was "in and out of it" at this point. *Id.* at 21. The next thing that she recalls is she awoke in a bed next to Appellee at approximately 5:30 a.m. They were in Appellee's parents' trailer. *Id.* at 21-22. N.D. did not know how she got there. *Id.* at 21. N.D. got up and left at which time she contacted a detective from the State College Police. *Id.* at 22.

After she left, Appellee and N.D. communicated via text messaging. Appellee apologized and said that it was the alcohol. *Id.* at 24-25. In the text messages, N.D. told Appellee that she did not want to have sex and that she felt violated. *Id.* at 25. Appellee kept apologizing. *Id.* at 25-26.

When Appellee was questioned by the police, he originally told them that N.D. had consented to the sexual activity that occurred in the front seat

of her car. Statement of Facts, Criminal Complaint, 11/17/15, at 2. A polygraph test was then administered to Appellee that indicated deception. It was at this time that Appellee admitted that N.D. said "we shouldn't be doing this". *Id.* Appellee said he originally lied because he was scared. *Id.*

In comparing the two factual scenarios surrounding the crimes in question, it is clear that there are some similarities – Appellee had sexual intercourse with two women, both of whom told him to stop and did not consent.[2] The similarities, however, end there. In 2009, Appellee and an ex-girlfriend went to Angelo's Bar.[3] J.G. then invited Appellee to spend the night at her house and allowed him to be in the same bed with her. J.G. wanted to go to sleep, but Appellee tried to initiate sex by rubbing J.G.'s back, arms and legs. Appellee then got on top of J.G. and pinned down her arms. J.G. told Appellee to stop but he continued by removing J.G.'s sweat pants and

---

[2] The Dissent "disagrees with the majority's conclusion that the two sexual assaults did not share relevant similarities." Dissenting Memorandum at 11. I agree with the learned Dissent that the two sexual encounters "share relevant similarities". However, in order to find a common scheme or design for purposes of Pa.R.E. 404(b), our Supreme Court has made it clear that the proffered prior bad acts and the underlying charged crime must be strikingly similar so as to present a "virtual signature." *Hicks*, 156 A.3d at 1125, 1128. Sharing "relevant similarities" is not sufficient.

[3] The learned Dissent states that Appellee and his ex-girlfriend, J.G. "spent an evening out drinking alcoholic beverages at a local bar in Lock Haven." Dissenting Memorandum at 4. Thus, the implication is that Appellee and/or J.G. were intoxicated. There is nothing in the 2009 criminal complaint that indicates that Appellee and J.G. were drinking alcoholic beverages at Angelo's Bar or that either was impaired in any way. *See* Criminal Complaint, 5/26/09.

underwear. He grabbed J.G. around the neck and shoved her head up to the headboard. He held her there until he finished. When questioned about the events by the police, Appellee said that, at first, the sex was consensual but as he and J.G. were having sexual intercourse, J.G. told him to stop.

In the instant action, Appellee and N.D. were mere acquaintances who went barhopping with a group of friends. N.D. consumed a significant amount of alcohol throughout the evening and was clearly intoxicated.[4] By the end of the evening, she was feeling "fuzzy" and "in and out of it". N.D. inferred that someone (most likely Appellee) spiked her drinks at the Hangar 9 as the beer tasted funny. After leaving the Valley Hotel, Appellee drove N.D. to a park behind a Walmart. He stopped the car, crawled on top of N.D., removed one

_____

[4] The Dissent notes that "the Commonwealth seeks to introduce evidence of Appellee's 2009 conviction for indecent assault to establish that he engaged in a course of conduct with N.D. **targeted towards taking advantage of N.D.'s weakened capacity** so that he could have sexual intercourse with her." Dissenting Memorandum at 7 (emphasis added). The Dissent goes onto state that "[s]imilarly, in 2009, Appellee **took advantage of J.G.'s inebriated state after a night spent drinking alcohol**". *Id.* at 8 (emphasis added). Thus, the learned Dissent concludes that "the significant similarity [between the 2009 and the 2015 incidents], in my view, is the manner in which Appellee preyed on his victims and intentionally arranged the circumstances so that he was in a position to take advantage of their weakened state." *Id.* Again, I note that nothing in the certified record before us indicates that J.G. and Appellee spent the night drinking alcohol or that J.G. was inebriated or in a "weakened state." The only evidence is that Appellee and J.G. spent the evening at Angelo's Bar. Moreover, although Appellee is alleged to have "intentionally arranged the circumstances so that he was in a position to take advantage" of N.D., by taking her car keys, the evidence surrounding the 2009 incident was that J.G. **invited** Appellee into her home and into her bed. Nothing in the record reflects that Appellee "intentionally arranged the circumstances" to get J.G. in bed.

of N.D.'s pant legs and underwear legs, and penetrated her vaginally with his penis. N.D. next recalls waking up in bed with Appellee at Appellee's parents' trailer. When questioned by the police about this incident, Appellee said that the sex was consensual. It was not until Appellee failed a polygraph test that he admitted N.D. told him to stop.

In my view, the facts surrounding the 2009 and the 2015 assaults show crimes of the same class; *i.e.*, indecent assault. However, the facts do not support a finding that the crimes were "**so unusual or distinctive as to be like a signature**." *Hicks*, 156 A.3d at 1125-1126 (emphasis added). One incident involved a former girlfriend who invited Appellee to her home and into her bed. There is no evidence that the victim was intoxicated or impaired in any way. Appellee wanted to have sex with the victim who said "no". He then crawled on top of her, pinned her arms down while he removed her pants and underwear. Appellee then grabbed the victim by her neck and shoved her head up against the headboard while he penetrated her. When asked about the incident, Appellee said that the sexual encounter started out as consensual but that the victim told him to stop in the middle of the encounter. The other incident, that occurred over six years later, involved an acquaintance of Appellee's who was clearly intoxicated or impaired as the evening continued. In fact, the victim inferred that someone (most likely Appellee) spiked her drinks. Appellee drove the victim to a park behind a Walmart at which time he crawled on top of her, held her down by his body weight, removed one of

her pant legs and had intercourse.[5]  Appellee first told the police that it was consensual; however, when a polygraph test revealed deception, he admitted that the victim told him "no".  The 2009 incident involved a former girlfriend and the assault, which was much more violent, occurred in the victim's bed. Appellee immediately told the police that, although the sexual encounter started out as consensual, the victim told him to stop during the sexual encounter but he continued.  The 2015 incident involved an impaired acquaintance who was assaulted in the front seat of a car behind a Walmart. Appellee did not admit that the sexual encounter was non-consensual until after he failed a lie detector test.  I do not believe that these facts compel a finding that there are striking similarities between the two events that establish a logical connection tantamount to a "virtual signature."

Moreover, I do not believe, as the learned Dissent does, that the assault carried out against J.G. is admissible to show the absence of mistake on the part of Appellee as to whether N.D. consented to sexual intercourse.  First, as I previously discussed, I do not find that the assaults were strikingly similar. Secondly, although the record establishes that J.G., like N.D., did not consent to sexual intercourse, I cannot conclude that J.G., like N.D., lacked awareness as to what was occurring.  Nothing in the 2009 criminal complaint indicates that J.G. was impaired or unaware in any way.  Accordingly, I believe that the

---

[5] Unlike the 2009 assault against J.G., there is no evidence that Appellee pinned down N.D.'s arms or grabbed her by the neck.

trial court did not abuse its discretion in prohibiting the Commonwealth from introducing evidence of the 2009 crime.

In light of our standard of review and after finding that the two incidents are not strikingly similar, I am compelled to find that the trial court did not abuse its discretion. Thus, I agree with the learned Majority that the trial court should be affirmed.