J-A01006-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN HART | : | |
| | : | |
| Appellant | : | No. 3284 EDA 2016 |

Appeal from the Judgment of Sentence May 26, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0004175-2012

BEFORE: LAZARUS, J., OTT, J., and PLATT*, J.

MEMORANDUM BY LAZARUS, J.:           **FILED MAY 22, 2018**

John Hart appeals from his judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, after a jury convicted him of stalking and harassment. Upon careful review, we affirm.

The trial court set forth the facts of this case as follows:

[Hart] and the complainant, [E.V.T.], a local [t]elevision [n]ews personality, met on Facebook in August of 2011. After exchanging e-mails for a month, the complainant gave [Hart] her cell phone number and they arranged to meet for drinks at the Ritz Carlton in Philadelphia on Labor Day, 2011.

They began dating and went out together about five (5) times and [Hart] stayed over at [complainant's] apartment on one occasion. Not long after [Hart] spent the night at [complainant's] apartment, the complainant decided to end the relationship and told [Hart] she was no longer going to see him. Subsequent to the decision to end the relationship with [Hart] on October 6, 2011, the complainant received a message from Facebook stating that she was trying to change her password. Although she had not been trying to change her password, she thought nothing of it. After that[,] on October 13, 2011, the complainant began to

_____

*   Retired Senior Judge assigned to the Superior Court.

receive abusive text messages threatening to end her career by releasing negative gossip to the press and referencing private information she had shared with [Hart] while they were dating. Her telephone numbers were changed, and her cable was shut off three (3) times by someone calling the provider and terminating service. The complainant also began receiving multiple telephone calls from blocked numbers and when she would answer, the caller would hang up. This continued for many days and the calls were always from a blocked number.

The complainant reported the incidents to the police and a detective was assigned. Detective [Steve] Parkinson retrieved a recording from the complainant's telephone provider. The recording was of a man attempting to disguise his voice as that of a woman and trying to have the complainant's telephone service cancelled. The complainant immediately recognized the voice as that of [Hart].

[Hart] also had a relationship with Laura Selvage[,] who he met on Facebook in January of 2011. Ms. Selvage[,] who lived in Baltimore, Maryland, shared Facebook messages with [Hart] for a month before she gave him her telephone number and they began talking on the telephone. She subsequently agreed to a date and went out with [Hart] in late February or early March, 2011. A few weeks later, [Hart] came back to Baltimore and had dinner at Ms. Selvage's home with her parents. The next day, he once again returned to Baltimore and took Ms. Selvage out to dinner. Upon their return to Ms. Selvage's home, they went to the basement to watch a movie. Ms. Selvage fell asleep and when she woke up, [Hart] began speaking to her in a feminine voice. Startled, she stood up and told [Hart] to leave. They continued talking by telephone for the next week or two[,] with [Hart] wanting her to change her Facebook status to "being in a relationship." Realizing she wasn't interested in a relationship with [Hart], Ms. Selvage began telling him she wasn't interested. [Hart] responded by sending threatening and abusive text messages including private information [Ms. Selvage] had shared with [him] while they were dating. When Ms. Selvage blocked [Hart] from being able to call or text her, she began to have website accounts cancelled without her permission and passwords to various accounts changed without her authorization. Her cellphone number was changed without her permission five (5) times. She received calls from numbers that were blocked or unknown and when she answered there would be silence. This occurred fifteen (15) to twenty (20) times daily for two (2) months. Ms. Selvage had her debit card

cancelled without her authorization. When she inquired about it, she was told someone with a female voice had called and cancelled the card.

Michael Sander, [Hart's] [p]arole [a]gent, testified he had listened to the recording of the man attempting to disguise his voice as that of a woman and identified it as that of [Hart].

[Hart] presented witnesses (Barry Goldstein, Esquire, a family friend; Kevin Thompson, [Hart's] uncle[;] and Jill Pizzola, [Hart's] former girlfriend)[,] who testified they had listened to the tape recording and could not tell if it was [Hart's] voice or not.

Trial Court Opinion, 2/24/17, at 3-5 (citations to record omitted).

On November 16, 2011, Hart was arrested and charged with identity theft, disruption of service, possession of instruments of crime, harassment, unlawful use of a computer and stalking. On November 12, 2015, a jury found him guilty of harassment and stalking and, on May 26, 2016, the trial court sentenced him to 2½ to 5 years' incarceration, followed by two years of probation. Post-sentence motions were denied and Hart filed a timely notice of appeal to this Court, followed by a court-ordered statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Hart raises the following issues for our review:

1. Whether the Commonwealth's evidence was sufficient to find [Hart] guilty of stalking and harassment beyond a reasonable doubt, where the jury found reasonable doubt of guilt and acquitted [Hart] of all of the offenses (identity theft, disruption of service, possessing an instrument of crime, and unlawful use of computers) which would have constituted the only methods in which [Hart] would have committed the offenses of stalking and harassment, and where the same evidence was insufficient to convict [Hart] of stalking and harassment in isolation?

2.  Whether the guilty verdicts on the charges of stalking and harassment were contrary to the weight of the evidence so as to "shock the conscience" of the court?

3.  Whether the trial court erred by admitting evidence of "other crimes"/"prior bad acts" allegedly committed by [Hart] in the form of testimony from Laura Selvage and any related physical evidence or documentary evidence (text messages) in contravention of [Pennsylvania Rule of Evidence] 404(b) where no exceptions to the [rule] apply?

4.  Whether the trial court erred by admitting into . . . evidence . . . alleged text messages from [Hart] to Laura Selvage which were transcribed by Selvage[,] where the text messages could not be properly authenticated and where therefore the prejudice caused by the admission of the transcribed text messages outweighed their specious probative value?

5.  Whether the trial court erred by admitting into . . . evidence . . . alleged text messages from [Hart] to Laura Selvage where the transcribed text messages failed to show alleged responses from Selvage in violation of the rule of completion, and where therefore the prejudice caused by the admission of the transcribed text messages outweighed their specious probative value?

6.  Whether the trial court erred in [not] granting an evidentiary hearing where [Hart] raised issues of ineffectiveness of trial counsel within his post[-]sentence motions, in contravention of Pennsylvania appellate court holdings in *Commonwealth v. Moore*, 978 A.2d 988 (Pa. Super. 2009)[,] and *Commonwealth v. Bomar*, 826 A.2d 831 (Pa. 2003)?

Brief of Appellant, at vi.

Hart first claims that the evidence was insufficient to convict him of harassment and stalking, where he was acquitted of the crimes that were the only means by which he could have harassed or stalked the victim.  Hart also argues there was no reliable evidence to prove that Hart was the person who caused the problems the victim experienced.  He asserts that the Commonwealth's case was almost entirely circumstantial and based on

unreliable voice identifications by lay persons; that the Commonwealth produced no forensic or technical evidence that Hart tampered or interfered with the victim's (or Selvage's) internet, cable, or cell phone accounts; and that the Commonwealth failed to prove how he could have obtained the personal information necessary to do so. Hart is entitled to no relief.

We begin by noting that

[f]ederal and Pennsylvania courts alike have long recognized that jury acquittals may not be interpreted as specific factual findings with regard to the evidence, as an acquittal does not definitively establish that the jury was not convinced of a defendant's guilt. Rather, it has been the understanding of federal courts as well as the courts of this Commonwealth that an acquittal may merely show lenity on the jury's behalf, or that the verdict may have been the result of compromise, or of a mistake on the part of the jury.

**Commonwealth v. Moore**, 103 A.3d 1240, 1246 (Pa. 2014) (citations and quotation marks omitted). While Hart acknowledges that inconsistent verdicts will not support a sufficiency claim, he asserts that his case falls under an exception to that rule. Specifically, he cites **Commonwealth v. Magliocco**, 883 A.2d 479 (Pa. 2005), and **Commonwealth v. Watson**, 431 A.2d 949 (Pa. 1981). However, both cases are readily distinguishable.

In **Magliocco**, the defendant was charged with terroristic threats and ethnic intimidation. He was convicted of ethnic intimidation, but acquitted of terroristic threats, which, at the time, was a predicate offense to ethnic intimidation. Magliocco challenged the sufficiency of the evidence supporting his conviction for ethnic intimidation. The Supreme Court concluded that, in acquitting the defendant, the jury found that he did not "commit" terroristic

threats. Because the commission of the crime of terroristic threats was a specific element of ethnic intimidation, the evidence was, therefore, insufficient to sustain the defendant's ethnic intimidation conviction. However, in that case, unlike the case at bar, it was the **fact** of the jury's acquittal, and not any **factual inference** drawn from the acquittal, that was the determining factor.

In **Watson**, the defendant was convicted of voluntary manslaughter and possession of a concealed weapon after raising a self-defense claim. On appeal, the defendant argued that the Commonwealth failed to meet its burden of disproving her self-defense claim beyond a reasonable doubt and, thus, that the evidence was insufficient to establish the necessary criminal intent to sustain her convictions. Our Supreme Court agreed, finding the Commonwealth had failed to disprove the self-defense claim, and, thus, the defendant killed her common law husband in self-defense. Applying that finding to the defendant's possession of a concealed weapon conviction, the Court concluded that "criminal intent cannot be inferred from the circumstances surrounding appellant's possession of the gun which killed her husband because appellant, having acted in self-defense, never used that gun to commit a crime." **Watson**, 431 A.2d at 953. Thus, unlike the case *sub judice*, **Watson** did not involve an inference from a jury acquittal or an inconsistent verdict challenge.

Based on the foregoing, Hart's claim based on the inconsistency of the jury's verdict must fail.

We review Hart's sufficiency of the evidence claim under the following standard:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Vargas*, 108 A.3d 858, 867–68 (Pa. Super. 2014) (citation omitted).

Hart was convicted of harassment and stalking. A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person:

. . .

(3) engages in a course of conduct or repeatedly commits acts which serve no legitimate purpose;

(4) communicates to or about such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures; [or]

(5) communicates repeatedly in an anonymous manner[.]

18 Pa.C.S.A. § 2709(a).

A person commits the offense of stalking when he "engages in a course of conduct or repeatedly communicates to another person under circumstances which demonstrate or communicate either an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress to such other person." 18 Pa.C.S.A. § 2709.1(a).

At trial, the Commonwealth presented evidence that Hart contacted the victim via Facebook and they began communicating with each other. The victim eventually went on approximately five dates with Hart. On one occasion, Hart spent the night at the victim's apartment and was alone in the apartment when the victim walked her dog. During the course of the brief relationship, the victim related to Hart a story about an ex-boyfriend she and several of her friends referred to as "the Straddler." The victim also told Hart about her close friend, Danny, as well as her fondness for the "Harry Potter" book series.

Following an incident in which the victim heard Hart create an elaborate lie about why he would be late to visit his brother, the victim determined that she was no longer interested in pursuing a relationship with Hart. She asked Hart to call her and, when he did, she told him "I think we want different things, and thank you so much, and please don't call me, essentially." N.T. Trial, 10/30/15, at 54. The victim testified that Hart seemed "irritated" and "a bit agitated" in response and attempted to make it seem "like he was the one rejecting [the victim] instead." *Id.* at 55.

Less than a week thereafter, the victim was notified that someone was attempting to change her Facebook password. She then began receiving threatening and abusive texts from an unknown Yahoo email address, some of which made reference to her friend Danny, "the Straddler," and Harry Potter, as well as the fact that her cell phone number had been changed multiple times. The victim's cable account was also cancelled three times, all without her permission. The victim testified that the texts and attacks on her cable and cell phone accounts made her feel scared and described it as a "private hell." N.T. Trial, 11/3/15, at 48. She contacted police, who obtained a recording from her cell phone carrier of the voice attempting to change her phone number. Although the voice sounded like a man pretending to be a woman, the victim "immediately knew it was John Hart." *Id.* at 74. She testified that she recognized "the way and the rate at which he spoke," "the way he said thank you," because it was "something [she had] heard him say to waitresses," and the way "his voice goes up at the end." *Id.* Hart's parole officer, Michael Sander, also testified that he recognized the voice as Hart's. In particular, Sander recognized his "speech patterns and intonations" and noted that the voice said "and things like that" and "that's correct," which were both common to Hart's speech patterns. N.T. Trial, 11/5/15, at 15.

This evidence alone, as well as the reasonable inferences derived therefrom, if believed by the factfinder, demonstrated that Hart "engage[d] in a course of conduct or repeatedly commits acts which serve no legitimate purpose" and "communicate[d] repeatedly in an anonymous manner[.]" ***See***

18 Pa.C.S.A. § 2709(a). Additionally, the evidence proved that Hart engaged in a course of conduct or repeatedly communicated to the victim under circumstances which demonstrated or communicated either an intent to place such the victim in reasonable fear of bodily injury or to cause substantial emotional distress to the victim. *See* 18 Pa.C.S.A. § 2709.1(a). To the extent that Hart claims the evidence was insufficient because it was "completely circumstantial and unreliable," he is entitled to no relief. It is well-settled that the Commonwealth can meet its burden of reasonable doubt by means of wholly circumstantial evidence. ***Commonwealth v. Pennix***, 176 A.3d 340, 343 (Pa. Super. 2017). In addition, the reliability of evidence goes to its weight, not sufficiency. ***Commonwealth v. Sullivan***, 581 A.2d 956, 959 (Pa. Super. 1990).

Hart next claims that the verdict was contrary to the weight of the evidence.

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well settled that the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Commonwealth v. Houser*, 18 A.3d 1128, 1135–36 (Pa. 2011) (citations and internal quotation marks omitted).

Here, the jury heard the testimony of the witnesses and concluded that Hart had committed the crimes of harassment and stalking. It is within the sole province of the jury, sitting as fact-finder, to review the evidence and assess the credibility of the testifying witnesses. *Commonwealth v. Williams*, 854 A.2d 440, 445 (Pa. 2004). The trial court, which also observed the demeanor and testimony of the witnesses, concluded that "the verdict reached in this matter would [not] shock the conscience of a reasonable person reviewing the evidence as it was presented at trial." Trial Court Opinion, 2/24/17, at 8. Based on our review of the record, we can discern no abuse of discretion on the part of the trial court in so concluding.[1]

Hart next claims that the trial court erred in admitting the testimony of Laura Selvage under the "common plan, scheme or design" exception to the general rule excluding evidence of prior bad acts or crimes. Hart argues that Selvage's testimony fails to demonstrate a common scheme, plan or design

---

[1] As part of his weight claim, Hart alleges that the victim falsely claimed that Hart "only spent one night with her where the couple had intercourse," while the Commonwealth allegedly stipulated that the victim told Detective Parkinson "that she had intercourse with [Hart] on two nights[.]" Brief of Appellant, at 21. In fact, the record contains no mention of intercourse whatsoever. We note with disapproval that this argument is not only a clear misstatement and embellishment of both the victim's testimony and the stipulation of the parties, but is also a transparent attempt by Hart and/or his counsel to impugn the victim's character by intentionally mischaracterizing her testimony to include reference to sexual relations, where no such reference was made or even suggested.

- 11 -

and that the trial court "failed to consider substantial differences in the technical problems allegedly suffered by the two women." Brief of Appellant, at 25. Specifically, Hart argues that, while the victim received anonymous abusive and threatening text messages, Selvage never received any anonymous texts. Selvage's membership in the website Care.com was revoked and her passwords for Facebook, MySpace and two email accounts were changed, while the victim did not testify that any of her internet passwords were changed. Finally, Selvage's debit card was cancelled without her knowledge, while the victim's bank or credit card accounts were not tampered with. Hart is entitled to no relief.

Initially, we note that:

> [t]he admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

**Commonwealth v. Woodard**, 129 A.3d 480, 494 (Pa. 2015) (quotation marks and citations omitted).

The general threshold for admissibility of evidence is relevance. Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence to determining the action. Pa.R.E. 401. All relevant evidence is admissible, subject to certain exceptions. Pa.R.E. 402. Relevant to this claim, evidence

of another crime, wrong, or other act is not admissible to prove a person's character or to show that, on a particular occasion, the person acted in accordance with that character. Pa.R.E. 404(b)(1). However, such evidence may be admissible to prove

> (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial, in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.

*Commonwealth v. Lark*, 543 A.2d 491, 497 (Pa. 1988) (citation omitted).

Evidence will not be prohibited merely because it is harmful to the defendant. *Commonwealth v. Dillon*, 925 A.2d 131, 141 (Pa. 2007). Rather, evidence will be excluded where the probative value of the evidence might be outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, pointlessness of presentation, or unnecessary presentation of cumulative evidence. Pa.R.E. 403. "Unfair prejudice" means a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially. Pa.R.E. 403, comment. When weighing the potential for prejudice, a trial court may consider how a cautionary jury instruction might ameliorate the prejudicial effect of the proffered evidence. Pa.R.E. 404(b), comment.

In order for evidence of other criminal activity to be admissible to establish a common scheme, two conditions must be satisfied: (1) the probative value of the evidence must outweigh its potential for prejudice against the defendant; and (2) a comparison of the crimes must establish a logical connection between them. ***Commonwealth v. Arrington***, 86 A.3d 831, 842 (Pa. 2014). "To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have done the other." ***Commonwealth v. Hicks***, 156 A.3d 1114, 1125 (Pa. 2017), quoting ***Shaffner v. Commonwealth***, 72 Pa. 60, 65 (1872).

> In further explaining the logical connection standard, this Court has noted "much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual or distinctive as to be like a signature." ***Commonwealth v. Rush***, [] 646 A.2d 557, 560–61 ([Pa.] 1994) (crimes containing uniquely similar attributes constitute a signature), quoting MCCORMICK ON EVIDENCE, § 190 at 449 (2d Ed. 1972) (emphasis omitted). ***See also Commonwealth v. Hughes***, [] 555 A.2d 1264, 1282 ([Pa.] 1989) (similarities in crimes not confined to insignificant details represent a signature); [***Commonwealth v.***] ***Weakley***, 972 A.2d [1182,] 1189 [(Pa. Super. 2009)] (identity of perpetrator in underlying crime may be proved through other acts where they "share a method so distinctive and circumstances so nearly identical as to constitute the virtual signature of the defendant").

*Hicks*, 156 A.3d at 1125–26. However, "[t]he common scheme exception does not require that the two scenarios be identical in every respect." *Commonwealth v. Tyson*, 119 A.3d 353, 360 n.3 (Pa. Super. 2015).

Here, Hart argues that there is "no logical or factual connection between [the victim] and Selvage." Brief of Appellant, at 28. He is incorrect. The harassment to which Selvage was subjected after she broke off her relationship with Hart bore striking similarities to that experienced by the victim. Hart's courses of conduct with regard to both women were distinctive and possessed a sufficient commonality of factors, such as to permit the conclusion that they were logically connected and presented a "virtual signature." Specifically, in both cases Hart: met the women by approaching them on Facebook; engaged in short-term romantic relationships that were both ended by the women; pressured the women and engaged in behavior the women found to be disturbing;[2] threatened to reveal information the

_____

[2] The victim testified that Hart told an elaborate and disturbingly detailed lie, ostensibly to his brother, about why he was running late for their meeting. Hart also pressured the victim to visit his high school with him, which she interpreted to mean that "he wanted this relationship to get more serious . . . it just seemed he wanted things to develop." N.T. Trial, 10/30/15, at 54. Selvage testified that Hart pressured her to change her Facebook status to "in a relationship," even after she indicated that she was not interested in pursuing anything further with him. He also posted a comment on her Facebook page that "turned [her] off" and caused a "fight" between them. N.T. 11/3/15, at 76, 77.

- 15 -

women had shared with him in confidence;[3] insulted the women's romantic abilities and physiques;[4] called the women from blocked numbers, remained silent and hung up when they answered; repeatedly cancelled services to which the women subscribed;[5] and affected a high, feminine voice in an effort to change or cancel services without permission.[6]

The foregoing facts demonstrate that Hart engaged in a common scheme, plan, or design to harass, annoy and generally disrupt the lives of former paramours who had romantically rejected him. The evidence revealed a singular purpose in Hart's mind, *Hicks*, *supra*, to accomplish this end in both cases. The factual overlap between the two scenarios goes beyond the

_____

[3] In Selvage's case, Hart threatened to reveal her drug experimentation to her father. In the victim's case, Hart threatened to falsely claim that the victim had given her friend Danny the nickname "the Straddler," to ruin her career, and to give information about the victim to a local gossip columnist.

[4] Hart called Selvage "sugar tits" and told her "you kissing, were GAY." *See* N.T. Trial, 11/3/15, at 71. The victim received texts stating "[d]o you even realize what a fucking tool you are, not one redeeming quality, not even good in bed," calling her a "fucking whore" and saying she had a "fat ass." *See* N.T. Trial, 10/30/15, at 59-60.

[5] Selvage's Facebook, MySpace, Care.com and T Mobile passwords and/or memberships were altered. The victim's cell phone number was repeatedly changed and her cable and internet services were cancelled multiple times. The victim also received messages from Facebook indicating that someone had tried to change her password.

[6] Selvage's Bank of America debit card was cancelled by someone described by the company as a woman. Selvage also testified that Hart once spoke to her in a "creepy," "feminine," "high" voice, asking her to cuddle. N.T. Trial, 11/3/15, at 63. The victim's cell phone number was changed by a person that a company representative said "sounded like a man doing a woman's voice." N.T. 10/30/15, at 70. The victim subsequently identified the voice as Hart's.

commission of crimes or conduct of the same general class. **Rush**, **supra**. Moreover, the small factual distinctions noted by the two victims (i.e., different websites and accounts hacked, etc.) are not substantial enough to disqualify Selvage's testimony as proof of a common scheme, plan or design. Finally, the court gave limiting instructions, both prior to Selvage's testimony and during the jury charge, that Selvage's evidence was only to be considered for the purpose of "tending to show the defendant's identity in the case involving [the victim] and that the defendant engaged in a similar course of conduct toward both Ms. Selvage and [the victim] under the same circumstances, that is, when they ended a relationship with him." N.T. Trial, 11/10/15, at 21. The jury is presumed to follow the court's instructions. **Commonwealth v. Tilley**, 595 A.2d 575, 583 (Pa. 1991). For all the foregoing reasons, we find that the trial court did not abuse its discretion in admitting Selvage's testimony.

We will address Hart's next two claims together, as they both involve the admissibility of text messages. Hart claims that the trial court erred by admitting into evidence text messages from Hart to Selvage, which had been transcribed by Selvage, because the messages could not be properly authenticated. Hart argues that Selvage is an "adverse party" and, as such, "the likelihood of the accuracy of the transcription [is] much less reliable." Brief of Appellant, at 31. Moreover, Hart claims there was no corroboration from either Hart's or Selvage's cell phone service provider regarding the time and date of the texts. Further, Hart asserts that the text messages were irrelevant to the case because the victim in this case "never received text

messages from [Hart] during or after their break up." *Id.* at 33. Hart also claims that the admission of the text messages violates the "rule of completeness," set forth in Pa.R.E. 106, and deprived the jury of the context of the text messages, "which in a vacuum were embarrassing to [Hart], and showed him in a negative and a potentially false light." *Id.* at 35. Hart argues the prejudice caused by the admission of the messages outweighed their probative value. Hart is entitled to no relief.

> Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact.

*Commonwealth v. Levanduski*, 907 A.2d 3, 13–14 (Pa. Super. 2006).

Pennsylvania Rule of Evidence 901 provides that authentication is required prior to admission of evidence. The proponent of the evidence must introduce sufficient evidence that the matter is what it purports to be. Pa.R.E. 901(a). Testimony of a witness with personal knowledge that a matter is what it is claimed to be can be sufficient. Pa.R.E. 901(b)(1). "[P]roof of any circumstances which will support a finding that the writing is genuine will suffice to authenticate the writing." *In re F.P.*, 878 A.2d 91, 94 (Pa. Super. 2005) (citations omitted). Circumstantial evidence may suffice where the circumstances support a finding that the writing is genuine. *Commonwealth v. Koch*, 39 A.3d 996, 1002 (Pa. Super. 2011), citing *In the Interest of F.P., a Minor*, *supra*.

- 18 -

This Court has held that electronic communications, such as e-mail and instant messages, can be authenticated within the framework of Pa.R.E. 901 and our case law, and that such evidence is to be evaluated on a case-by-case basis, like any other document, to determine whether there has been an adequate foundational showing of its relevance and authenticity. **Koch**, 39 A.3d at 1003. Relevant to the instant matter are two cases cited with approval by the Court in **Koch**:[7]

> In **People v. Chromik**, [] 946 N.E.2d 1039 (Ill. App.3 2011), an Illinois appellate court held that a transcription of text messages created by the school principal as read to him by the victim was authentic. While the transcription was not completely accurate, the dates and times of text messages sent from the defendant to the victim were consistent with phone company records. The victim also testified as to the contents of the text messages and the accuracy of the principal's transcription.
>
> Similarly, in **State v. Taylor**, [] 632 S.E.2d 218 ([N.C. App.] 2006), the court held that testimony from the network's strategic care specialist and the manager of a wireless store was sufficient to authenticate the transcription of the text messages sent to and from the victim's assigned cellular telephone number. The court held further that the text messages themselves contained sufficient circumstantial evidence tending to show the identity of the person who sent and received them.

---

[7] Hart cites **Koch** in support of his claim. However, the facts of **Koch** are inapposite. In that case, a police officer transcribed text messages from the defendant's cell phone. The Commonwealth attempted, successfully, to admit certain drug-related texts as evidence of the defendant's drug dealing. This Court reversed the trial court, finding that the texts were not properly authenticated. Unlike in the instant matter, however, there was no testimony establishing who wrote the texts, nor was there testimony from the recipient of the messages. There was also an absence of contextual clues tending to reveal the identity of the sender. Moreover, in **Koch**, the Commonwealth conceded that the defendant had not written all the texts that had been sent from her phone. Thus, **Koch** garners Hart no relief.

***Koch***, 39 A.3d at 1004.

In this case, Selvage testified that she personally transcribed the text messages, *verbatim*, as received on her phone from the cell phone number she used to communicate with Hart. In addition, the Commonwealth presented a print-out of records from Selvage's cell phone provider corroborating the time stamps Selvage transcribed in conjunction with the messages. Moreover, the texts contained numerous contextual clues that Hart had written them, including references to previous conversations and interactions between Hart and Selvage. Finally, Hart had ample opportunity to cross-examine Selvage as to the accuracy of her transcription. ***Cf. Commonwealth v. Mosley***, 114 A.3d 1072 (Pa. Super. 2015) (text messages excluded where no evidence, direct or circumstantial, clearly proving defendant was author of drug-related text messages, or any corroborating witness testimony regarding authenticity of messages).

Hart also argues that admission of the messages violates the "rule of completeness" because Selvage did not transcribe her own messages written in response to Hart's messages.[8] This claim is waived.

Pennsylvania Rule of Evidence 106 provides: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part--or any other writing or recorded

---

[8] Selvage testified that she did not save her own texts because "there's a limit to what I could save [on my phone], and at the time I really didn't think of saving my part of the conversation." N.T. Trial, 11/3/15, at 69-70.

statement--that in fairness ought to be considered at the same time." Pa.R.E.

106. The purpose of the rule is to

> give the adverse party an opportunity to correct a misleading impression that may be created by the use of a part of a writing or recorded statement that may be taken out of context. This rule gives the adverse party the opportunity to correct the misleading impression at the time that the evidence is introduced. The trial court has discretion to decide whether other parts, or other writings or recorded statements, ought in fairness to be considered contemporaneously with the proffered part.

Pa.R.E. 106, comment.

In order to preserve an evidentiary objection for purposes of appellate review, a party must interpose a timely and specific objection in the trial court. "The rule is well settled that a party complaining, on appeal, of the admission of evidence in the [c]ourt below will be confined to the specific objection there made." *Commonwealth v. Cousar*, 928 A.2d 1025, 1041 (Pa. 2007), quoting *Commonwealth v. Boden*, 159 A.2d 894, 900 (Pa. 1960). Here, defense counsel's objection to the admission of Selvage's transcribed text messages was based solely on authentication:

> MR. MCMAHON: If I may, Your Honor, this appears to be not the actual messages. It appears to be someone's summary of them sent from her to someone at Baltimore County government. Evidentiary wise, Your Honor, number one, there has to be a foundation or basis for this and for this document and how it was prepared, where it came from, how they attribute these to John Hart before they can be admissible.
>
> THE COURT: What is the offer of proof?
>
> MS. KATONA: The witness will testify that she prepared this document, that it is a printout of an email from her to the Baltimore County police officer who was initially contacted

regarding this investigation. They are exact copies – she'll testify that they are the exact copy and paste of the text messages sent by the defendant from the phone number she had for him.

Furthermore, Your Honor, Commonwealth's C-31 is a print out of [Selvage's] T-Mobile record from the dates of 3/26 and 3/27, that substantiates the time stamps back and forth between [Selvage] and the defendant, matching the text messages here.

MR. MCMAHON: If I may, Your Honor, obviously, as we had with [the victim], you had the texts and they are what they are. This is nothing other than someone writing down -- I mean, do we have the phone with these text messages? Do we have the companies['] recovery of the text messages? I could write that you sent me a text now and write whatever I want to write.

THE COURT: Well, certainly that would be ripe for cross-examination, but you did receive the discovery.

MR. MCMAHON: Yes. I'm aware this is what she's saying. My question is whether there has been a sufficient foundation to have her testify that these are the text messages, because the best evidence would be the text, would it not?

THE COURT: She prepared the document, correct?

MS. KATONA: Yes, Your Honor.

THE COURT: So I'm going to allow it. You can question her on cross-examination.

MR. MCMAHON: Okay. I got you.

N.T. Trial, 11/3/15, at 66-68.

Because Hart did not lodge a timely and specific objection on the basis of Rule 106, his argument is waived on appeal.

Lastly, the probative value of the text messages outweighs their potential for unfair prejudice. The striking similarities between the subject matter and other content of Hart's text messages to Selvage and the text messages received by the victim in this case gives the evidence considerable

probative value. In light of this fact, the nature of the text messages does not render them unduly prejudicial.

Finally, Hart claims that the trial court erred in failing to grant him an evidentiary hearing, where he raised issues of trial counsel's ineffectiveness in his post-sentence motions. In particular, Hart claims that counsel was ineffective in failing to object to the trial court's "flawed and inaccurate jury instruction on the offense of harassment." Brief of Appellant, at 37. Hart asserts that he is entitled to an evidentiary hearing under *Commonwealth v. Moore*, 978 A.2d 988 (Pa. Super. 2009), and *Commonwealth v. Bomar*, 826 A.2d 831 (Pa. 2003). Hart is entitled to no relief.

In *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002), our Supreme Court established the general rule that consideration of claims of ineffectiveness of counsel should be deferred until collateral review. In *Bomar*, our Supreme Court carved out an exception to the rule in *Grant*, allowing review of ineffectiveness claims on direct appeal where the claims have been raised and fully developed at a hearing in trial court.[9] Subseqently, however, the Court revisited the issue in *Commonwealth v. Holmes*, 79 A.3d 562 (Pa. 2013), in which it considered whether a trial court could ever

_____

[9] Hart's reliance on *Moore* is entirely inapposite. There, this Court simply held that "where a defendant has been found in violation of a [protection from abuse order ("PFA")], is sentenced pursuant to 23 Pa.C.S.A. § 6114(b), and alleges ineffectiveness of counsel, judicial economy may be best served by the PFA court conducting a post-sentence *Bomar* evidentiary hearing on a defendant's claims of ineffective assistance of counsel." *Moore*, 978 A.2d at 993.

consider an ineffectiveness claim in the context of post-sentence motions, and whether such claims were reviewable on direct appeal. The Court expressly limited the holding in *Bomar* to its pre-*Grant* facts and concluded that a trial court may, in its discretion, review ineffectiveness claims in only two circumstances: (1) where the ineffectiveness claim is both meritorious and apparent from the record so that immediate consideration and relief is warranted; and (2) upon good cause shown and only if accompanied by a waiver of PCRA rights. Beyond these two scenarios, ineffectiveness claims must be deferred to collateral review.

Here, Hart has not established that either exception applies to his case. First, his claim is not meritorious. Second, he has not waived his right to seek PCRA review. Accordingly, he is entitled to no relief.

Hart's ineffectiveness claim is based on counsel's failure to object to the trial court's "flawed and inaccurate jury instruction [on] the offense of harassment." Brief of Appellant, at 37. Specifically, Hart asserts that the trial court improperly included the definition of "emotional distress" in its instruction on harassment,[10] but, unlike the crime of stalking, the offense of

---

[10] The trial court issued the following instruction on harassment:

> [THE COURT:] Next, harassment. Once again, each element must be established beyond a reasonable doubt. A person commits the crime of harassment when they have the intent to harass, annoy or alarm another. The person engages in the course of conduct or repeatedly commits acts which serve no legitimate purpose and or communicates to or about such other

harassment does not include the element of emotional distress. Hart argues that "[i]t is very possible that the jury was confused by the incorrect reference to 'emotional distress' in the harassment instruction, and that the confusion led to a guilty verdict for stalking." *Id.* at n.14.

While Hart is correct that the definition of "emotional distress" was irrelevant to the harassment charge against him,[11] we fail to comprehend how an extraneous definition included in the harassment charge could have influenced the panel's verdict on stalking. Moreover, if anything, any confusion caused by the court's seeming inclusion of an additional element in

persons any lewd, lascivious, threatening or obscene words, language, drawings or caricatures and or communicates repeatedly in an anonymous manner.

Communicate means to convey a message without intent of legitimate communication or address by oral, non-verbal, written or electronic means including telephone, electronic mail, Internet, wireless communication or similar transmission.

Course of conduct is a pattern of actions composed of more than one act over a period of time, however short.

Evidence is continuity of conduct. The term includes lewd, lascivious, threatening or obscene words, language drawings, caricatures or actions either in person or anonymous.

**Emotional distress, a temporary or permanent state or mental anguish**. Again, each element must be established beyond a reasonable doubt.

N.T. Trial, 11/10/15, at 25-26 (emphasis added).

[11] The harassment statute does contain a definition of the term "emotional distress," but it is only relevant to subsection 2709(a.1) (cyber harassment of a child).

the definition of harassment could only have helped Hart by leading the jury to believe that an additional element of proof was necessary to a finding of guilt on that charge.

For the foregoing reasons, the trial court did not err in denying Hart an evidentiary hearing on his meritless ineffectiveness claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/22/18