**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| STEVEN MICHAEL COPE, JR. | : | |
| | : | |
| Appellant | : | No. 942 WDA 2022 |

Appeal from the Judgment of Sentence Entered July 25, 2022
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-CR-0000830-2021

BEFORE:   PANELLA, P.J., BENDER, P.J.E., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED:  August 18, 2023**

Appellant, Steven Michael Cope, Jr., appeals from the judgment of sentence of 23 to 46 years of incarceration, imposed following his jury trial convictions for several sexual assault crimes committed against two male minors.  Appellant challenges the admission of uncharged allegations of sexual abuse against a third minor, as well as the admissibility of hearsay statements under the Tender Years Hearsay Act ("TYHA"), 42 Pa.C.S. § 5985.1.  We affirm.

Appellant is the half-brother of the victims, D.C. and T.S.  The alleged abuse occurred in May of 2018, when D.C. was ten years old and T.S. was five.  By the time of trial, the victims were fourteen and ten.  The abuse occurred one evening in the March of 2018, when Appellant, who lived in the residence, watched the children overnight while their mother, J.C., was in New

_____

[*] Retired Senior Judge assigned to the Superior Court.

York City. When J.C. returned, T.S. told her that Appellant had tried to touch him in a sexual manner. The following morning, J.C. demanded that Appellant leave the residence. In 2019, D.C. disclosed that Appellant had touched him in his private area, and T.S. likewise disclosed that Appellant had abused him, prompting J.C. to report the abuse.

T.S. testified that Appellant masturbated in front of him and offered him fifty dollars if T.S. gave Appellant oral sex. Both T.S. and D.C. testified that Appellant put his mouth on their penises. Both victims were interviewed by a forensic specialist in May of 2019, the recordings of which were introduced at trial under the TYHA. In those interviews, D.C. stated that Appellant put his penis in D.C.'s anus. Both children stated that the incidents started with Appellant touching their penises.

Authorities learned that Appellant allegedly abused a five-year-old child, Z.G., while attempting to serve his arrest warrant. On February 10, 2021, Trooper David Wineland visited Z.G.'s home and spoke to his mother, T.T. During the ensuing conversation, Trooper Wineland stated that Appellant was wanted for sexual abuse. T.T. asked if she should ask her children if Appellant, who babysat Z.G. for several months while T.T. worked, had abused them. Trooper Wineland advised her to let the investigation continue and told her not to ask. T.T. testified that she ignored this advice and, immediately after the trooper departed, asked Z.G. if Appellant had touched him. Z.G. pointed to his crotch and made a circular motion with his finger. She reported this to authorities and, five days later, Z.G. sat for a forensic interview where he

- 2 -

again indicated that Appellant had touched his penis. The Commonwealth decided not to pursue charges against Appellant concerning Z.G.'s allegations. The trial court inquired about this during the pre-trial hearing and Trooper Charles Irvin explained, "Due to [Z.G.]'s age, even though he made some disclosures, his ability to articulate in more detail, he didn't have the maturity at the time to do that. The District Attorney's Office felt it was not an appropriate time to go forward." N.T., 4/20/22, at 32.

Appellant was convicted following a jury trial and sentenced as stated. On August 18, 2022, Appellant filed a timely notice of appeal and complied with the court's order to file a Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal. The trial court authored an opinion in response, and we now review Appellant's claims:

1. Whether the court commit[t]ed reversible error by improperly admitting certain evidence pursuant to Pa.R.E. 404(b), specifically the testimony of [T.T.], juvenile, Z.G., and Detective Irvin of the Greensburg police department, as well as the forensic interview conducted with Z.G., thereby denying … [A]ppellant of a fair trial as guaranteed by both the federal constitution and the [C]onstitution of the Commonwealth of Pennsylvania?

2. Whether the court commit[t]ed reversible error by improperly admitting evidence pursuant to the [TYHA] … specifically the testimony of alleged victims, T.S., D.C., and 404(b) witness, Z.G., thereby denying … [A]ppellant of a fair trial as guaranteed by the federal constitution and the [C]onstitution of the Commonwealth of Pennsylvania?

3. Whether the sentence, ordering Appellant to comply with the rules and regulations of SORNA[1] as a lifetime registrant is an

---

[1] The Sexual Offender Registration and Notification Act ("SORNA"), 42 Pa.C.S. §§ 9799.10-9799.42

- 3 -

illegal sentence, as that requirement exceedes [*sic*] the maximum statutory sentence for any offense for which … [A]ppellant was convicted?

Appellant's Brief at 7.

Appellant's first issue challenges the admission of Z.G.'s allegations of abuse. Pennsylvania Rule of Evidence 404(b) "embodies our pre-codification jurisprudence acknowledging the inadmissibility of propensity evidence." **Commonwealth v. Yale**, 249 A.3d 1001, 1018 (Pa. 2021). The common law rule held "that a distinct crime, unconnected with that laid in the indictment, cannot be given in evidence against a prisoner. It is not proper to raise a presumption of guilt, on the ground, that having committed one crime, the depravity it exhibits makes it likely he would commit another." **Shaffner v. Commonwealth**, 72 Pa. 60, 65 (Pa. 1872). The reason for barring this evidence is not one "of relevance, but of policy, *i.e.*, because of a fear that such evidence is so powerful that the jury might misuse the evidence and convict based solely upon criminal propensity." **Commonwealth v. Dillon**, 925 A.2d 131, 137 (Pa. 2007).

The text of Rule 404(b) codifies this general prohibition. "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). The Rule authorizes exceptions for "another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E.

404(b)(2). The Commonwealth must establish that "the probative value of the evidence outweighs its potential for unfair prejudice." *Id.*

The admission of evidence is reviewed for an abuse of discretion. *Commonwealth v. Drumheller*, 808 A.2d 893, 904 (Pa. 2002). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Harris*, 884 A.2d 920, 924 (Pa. Super. 2005) (citation omitted).

The threshold question for a Rule 404(b) analysis is whether the evidence is relevant to something other than propensity. In its Pa.R.A.P. 1925(a) opinion, the trial court explained that the evidence was relevant to show a "common plan, scheme, or design."

> Rule 404(b) allows evidence of other crimes "when it tends to prove a common plan, scheme, or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others." Pa.R.E. 404(b); *Commonwealth v. Saez*, 225 A.3d 169, 178 (Pa. Super. 2019); *Commonwealth v. O'Brien*, 836 A.2d 966 (Pa. Super. 2003) (two prior sexual assaults on minor boys admissible under common-scheme-or-plan exception in trial relating to assault on third minor boy). To determine whether bad acts evidence is admissible as evidence of a common plan or scheme, the trial court should ascertain "the details and surrounding circumstances of each criminal incident to assure that the evidence reveals criminal conduct which is distinctive and so nearly identical as to become the signature of the same perpetrator." *Commonwealth v. G.D.M., Sr.*, 926 A.2d 984, 987 (Pa. Super. 2007) (citation omitted). Some factors relevant to this inquiry include the types of victims chosen by the perpetrator, the time and place of committing the crimes, as well as the "patterns of action or

conduct" by the perpetrator to commit the crime. *G.D.M., Sr.*[,] 926 A.2d at 987.

> In this case, all three victims were males aged ten and under. The sexual assaults all happened in the victims' homes while the children's parents were away and … [Appellant] was acting as a babysitter. Also, … [Appellant] had known all three victims for a substantial period of time before assaulting them. The assaults all started with … [Appellant] touching [each] victim's penis. The assault on Z.G. ended at that point but the assaults on D.C. and T.S. progressed beyond that act. This [c]ourt found that these similarities were sufficient to show that the sexual assaults on D.C. and T.S. were part of a common plan or scheme which continued through the assault on Z.G.[,] and that evidence of each crime was relevant and admissible to prove the other.

Trial Court Opinion, 10/12/22, at 12-13 (citation omitted).

Appellant responds that this ruling constitutes an abuse of discretion because, "while there is a somewhat detailed account of the allegations that gave rise to the criminal charges, there is a near complete lack of detail with respect to the disclosure made by Z.G." Appellant's Brief at 13. Appellant agrees there are "broad commonalties between the allegations and the 404(b) material, [but] there is no nexus connecting them to the 'same perpetrator.'" *Id.* at 14. Specifically, Appellant argues that the allegations pertaining to Z.G. are not sufficiently similar to the allegations concerning D.C. and T.S.

> Yes, Appellant was in the care of the minors [*sic*], outside the presence of their respective parents, and all were under the age of ten. However, two of the victims were … Appellant's half-brothers. To say that he knew them for a substantial period of time would be a mischaracterization. Appellant knew, or at least knew of[,] each of them for the entirety of their lives. There was no evidence that … Appellant made any attempt to bring these two minors into his orbit for the purpose of sexually abusing them. They were his family. Moreover, there was no testimony that … Appellant knew Z.G. for any period of time beyond that which he was babysitting for [T.T]. As far as the time and place of

- 6 -

committing these crimes, the [c]ourts in the Commonwealth understand that crimes of a sexual nature often take place in isolation. **For the [t]rial [c]ourt to latch onto this only draws** … **Appellant into the larger pool of those who commit sexual violence.** Plainly stated, the attendant commonalities are too remote for the stringent requirements of 404(b).

*Id.* at 12-13 (emphasis added).

Appellant thus offers that little distinguishes the alleged assaults against Z.G. from acts committed by any other sexual offender, and therefore there is no specific plan that may be attributed to Appellant as a distinctive method of committing sexual assault. Accordingly, Appellant maintains that the evidence was used for a forbidden propensity purpose, as absent a common plan,[2] the introduction of Z.G.'s allegations, if believed by the fact-finder, established only that Appellant had a propensity for abusing children.

Initially, we note that Appellant concedes that the trial court properly determined that the evidence was relevant to a non-propensity purpose. "Based on the nature of the allegations, and the disclosure of Z.G., the [t]rial [c]ourt properly concluded that the 404(b) evidence at issue pointed to the 'common plan, scheme, or design'…." *Id.* at 12. This concession accepts that the evidence was relevant for the purpose of establishing a "common plan, scheme, or design," with a corresponding legal question of whether the allegations concerning Z.G. had the requisite degree of similarity demanded by caselaw.

_____

[2] This exception tends to be described as "common plan, scheme, or design." For ease of reference, we shall at times generically refer to it as the common plan exception.

- 7 -

The degree of similarity required when admitting evidence of other acts that are similar to the crimes alleged is a difficult question. Appellant's argument that there is an inadequate degree of similarity between the incidents has some force, in that the trial court stated, in a portion of its opinion, that it is obligated to determine whether the conduct "is distinctive and so nearly identical as to become the signature of the same perpetrator." *Id.* (quoting TCO at 12). At this juncture, we discuss the caselaw regarding "signature" crimes.

In certain fact patterns, evidence concerning other crimes may be relevant to establish identity, *i.e.*, that the person charged is likely to be the perpetrator due to similarities between the charged crime and those other acts. Consider the infamous London serial killer known as Jack the Ripper, who gruesomely killed women working as prostitutes in a certain area of London. The discovery of an additional victim who worked as a prostitute and who died in the same gruesome fashion would logically lead one to suspect that the identity of the killer was Jack the Ripper. Each individual aspect of the crime—the occupation of the victim, a gruesome death, the location of the crime—would not create this logical inference. Instead, it is the combination of those circumstances that supply the "signature" aspect of the crime. Introducing evidence of other acts on this basis logically requires a very high degree of similarity, at least when the purpose is to show that the defendant must have been the perpetrator of an unsolved crime bearing the same hallmarks.

Evidence relevant to the common plan exception is grounded in the notion that some crimes are so related that proof of one tends to prove the others. *Commonwealth v. Hughes*, 555 A.2d 1264, 1282 (Pa. 1989) ("The general rule, however, allows evidence of other crimes to be introduced to prove … a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others.") (ellipsis in original). Decisions discussing this theory sometimes require less than a true "signature" between the Rule 404(b) evidence and the charges at issue. In *Commonwealth v. Arrington*, 86 A.3d 831 (Pa. 2014), Arrington was convicted of the first-degree murder of his girlfriend. The Commonwealth argued that other-act evidence was admissible to establish a common plan "to control girlfriends through violence and intimidation." *Id.* at 842. The Commonwealth was permitted to introduce "evidence that [Arrington] physically assaulted three other girlfriends when they attempted to break up with him or interacted with other men." *Id*. The Court agreed that the evidence was admissible to support the cited common plan. "The testimony concerning [Arrington]'s treatment of other girlfriends demonstrated repeated efforts to preserve intimate relationships through harassment, intimidation, and physical violence culminating in the use of a deadly weapon." *Id.* at 844. Each of the three incidents shared common facts, and "[g]iven the shared characteristics of each relationship," the evidence was admissible. *Id.* The Court characterized the Rule 404(b) evidence as "admissible to establish a common scheme to aid in ascertaining

- 9 -

the killer's identity." ***Id.*** at 845. ***Arrington*** found no abuse of discretion in admitting Rule 404(b) evidence of a "common plan" comprised of prior acts committed by the defendant to establish "identity," even though those acts did not qualify as a true "signature."

Results like ***Arrington*** are criticized on the grounds that where the identity of the perpetrator is not meaningfully contested, the risk that the jury will consider the common plan evidence for the forbidden propensity purpose naturally increases. "It is natural and well-nigh inevitable … that a juror will conclude that, if a person has assaulted women before, he likely will do so again." ***Commonwealth v. Hicks***, 156 A.3d 1114, 1157 (Pa. 2017) (Wecht, J., dissenting). The occasional conflation of these two Rule 404(b) exceptions is illustrated by the divergent opinions in ***Hicks,*** wherein the Justices deeply split on the admissibility of Rule 404(b) evidence. There, authorities recovered several garbage bags containing the body parts of Deanna Null, with the exception of her hands. Authorities ultimately identified Hicks as a suspect based on, *inter alia*, a man stating that he had introduced Null to Hicks, with Hicks looking for prostitutes and drugs. Hicks acknowledged that he was a cocaine addict and knew the victim to be a prostitute. A search warrant for Hicks' home led to the discovery of several inculpatory items, including Null's hands.

The Commonwealth sought "to introduce evidence of prior bad acts through the testimony of eight women with whom [Hicks] had a sexual and/or prostitution-type relationship, which also involved the use of illegal narcotics

such as crack cocaine." *Id.* at 1119. The Commonwealth argued the evidence would establish "motive, identity and intent, as well as to rebut any defense based on accidental death." *Id.* The proposed witnesses would all testify that Hicks committed various assaults, which the Commonwealth argued "would demonstrate a common scheme ... to victimize prostitutes, or women engaging in prostitution to satisfy their addictions to controlled substances, such as the victim in the present case." *Id.* The Commonwealth maintained that the other incidents were sufficiently factually similar to Null's murder for these reasons:

> [T]heir experiences with [Hicks] bore striking similarities to the victim's murder for the following reasons: all were women who had engaged in prostitution and drug use with [Hicks], who had admitted to having sex and using drugs with the victim; the witnesses were assaulted primarily by being beaten or choked with [Hicks'] hands, and the blunt force trauma suffered by the victim was consistent with this type of assault; several of the witnesses were threatened with edged weapons, and the victim suffered numerous injuries by edged weapons; disputes arising out of a sexual encounter appeared to be the motive for many of the assaults, and [Hicks] admitted having a sexual relationship with the victim.

*Id.*

The trial court permitted the Commonwealth to admit evidence pertaining to seven of the eight, and the prosecution chose to introduce the testimony of three of these women. Hicks was convicted of murder and sentenced to death. Justice Dougherty, joined by then-Justice, now Chief Justice, Todd and Justice Mundy, concluded that the evidence was properly admitted under Rule 404(b) on the basis that the other-crimes evidence

- 11 -

showed both a "striking similarity—or logical connection—between the proffered prior bad acts and the underlying charged crime." *Id.* at 1125. The evidence concerning Hicks' "prior relationships with and assaults upon [the three women] showed they were strikingly similar to the circumstances surrounding his relationship with the victim, her injuries, and her subsequent death, such that there was a logical connection between them." *Id.* at 1127. The Court cited five specific facts justifying this conclusion: Hicks was introduced to women with drug dependencies who shared "similar body types"; he showed sexual interest in the women, some of which involved prostitution; he resorted to violence with these women; he injured each woman by targeting their necks with his hands or a sharp object; and he verbally threatened to kill each woman. *Id.* at 1123. These three Justices found that these similarities "not only establish the required logical connection[,] … they also present a 'virtual signature' for purposes of proving common scheme, intent and identity." *Id.* at 1128.

Then-Chief Justice Saylor and Justices Donohue and Wecht disagreed with the foregoing analysis, with then-Chief Justice Saylor concurring in the result and Justices Donohue and Wecht dissenting on the Rule 404(b) issue, concluding that the trial court erroneously introduced the evidence.[3] Beginning with the dissents, Justice Donohue opined that the plurality's

---

[3] Justice Baer stated that "the substantive evidentiary ruling in this case presents a close call," but found it unnecessary to reach the issue on the basis that any error in introducing the evidence was harmless beyond a reasonable doubt. *Id.* at 1139 (Baer, J., concurring).

- 12 -

identification of the five shared factual categories fell short of establishing a "signature" crime.[4] "The absence of a signature is particularly apparent from the extraordinarily broad categories the Majority creates in its strained effort to elucidate the required 'striking similarities.'" *Id.* at 1154 (Donohue, J., dissenting). Justice Donohue further discussed the distinction between using Rule 404(b) evidence for purposes of establishing identity versus proving a common scheme. "Although there is significant overlap between the various 404(b)(2) purposes … a 'signature' does not itself establish a 'common scheme,' even though a 'signature' and a 'common scheme' may, for example, both prove identity." *Id.* at 1144 n.3. Her opinion argued that other-act evidence may be introduced "to show motive, plan, design or scheme (which in turn may tend to show identity, intent, absence of accident, or some other fact in issue)," but only if those acts were part of an overarching plan. *Id.* at 1144. Justice Donohue reviewed caselaw at length and criticized decisions like *Arrington*, which the three-Justice plurality heavily relied upon, for conflating the theories. "*Arrington*, in my view, is the unfortunate culmination of the conflation of the requirements to establish a signature crime with those necessary to establish a common scheme or plan[;] … where the similarities are insufficient to establish a signature crime, and there is no true

_____

[4] Justice Wecht joined Justice Donohue's Rule 404(b) analysis and wrote separately to address the Commonwealth's decision to abandon a harmless error argument.

plan, the evidence shows only the defendant's propensity and must be prohibited." *Id.* at 1151-52.

On these points, then-Chief Justice Saylor agreed with Justice Donohue's criticisms. "I agree with Justice Donohue that various majority opinions of this Court, like the decisions of a number of other courts, have incorrectly blended various distinct grounds for relevance associated with proffered, uncharged misconduct." *Id.* at 1130 (Saylor, C.J., concurring). With respect to admitting other-crime evidence for purposes of establishing identity, he agreed that "majority opinions of this Court … have substantially diluted the putatively stringent standard associated with at least one of these, namely, proof of identity via a *modus operandi* theory." *Id.* He agreed that "the threshold for the use of uncharged misconduct as evidence of *identity* should remain high, in accordance with the signature-crimes analysis related by Justice Donohue." *Id.* (emphasis in original). But where the uncharged misconduct is introduced to establish something other than identity, he argued that the higher standard associated with proof of identity need not necessarily apply. In *Hicks*, the other evidence did not "truly implicat[e] an identity-based theory of relevance,"; instead, the "evidence of [Hicks]' other assaults upon women went toward negating his defense that the death was an accident." *Id.* at 1131. Thus, the evidence established the *actus reus* by corroborating the Commonwealth's evidence that the death resulted from a homicide. He cited the "doctrine of chances" theory, *see generally id.* at 1131-34, as representing a "non-character-based path of logical reasoning

- 14 -

that sufficiently comports with the ideals underlying Rule of Evidence 404, as well as its express terms." *Id.* at 1134.

These criticisms of the Rule 404(b) precedents demonstrate that Appellant's fundamental claim that the Commonwealth failed to show a "signature" crime is not unfounded, as the circumstances of the three assaults do not include any combination of traits that are so sufficiently specific to Appellant that they could be said to be a true "signature."[5] Moreover, identity was not seriously contested, as Appellant did not dispute that he babysat the victims but instead claimed that he did not commit the acts.

Notwithstanding, Appellant concedes that the evidence would be relevant to establishing a common plan, and based on precedents like **Arrington**, which the three-Justice plurality followed in **Hicks**, and several decisions we now address, we conclude that the Z.G. incident was sufficiently

---

[5] Courts often describe the common plan exception and the identity exception as requiring nearly identical degrees of similarity. For example*,* in **Commonwealth v. Cosby**, 224 A.3d 372 (Pa. Super. 2019), *vacated on other grounds,* 252 A.3d 1092 (Pa. 2021), the Commonwealth argued that the comedian Bill Cosby had a pattern of sexual abuse that was "so distinct … that they are all recognizable as [his] handiwork," thereby permitting the admission of testimony from 19 victims who would testify to sexual misconduct by Cosby. *Id.* at 398. Alternatively, the Commonwealth alleged that this testimony was admissible as a "common scheme." *Id.* at 397. We stated that "under both exceptions, the standard for admission is virtually the same. The … evidence must be distinctive and so nearly identical as to become the signature of the same perpetrator, and its probative value must not be undermined by the lapse in time between incidents." *Id.* at 401 (quotation marks and citation omitted).

similar to the assaults against the other two victims to justify its admission under that theory.

In one of the cases cited by the Commonwealth at the pre-trial hearing and relied upon by the trial court in its opinion, **Commonwealth v. O'Brien**, 836 A.2d 966 (Pa. Super. 2003), O'Brien was charged with raping a ten-year-old boy in 1996, and the Commonwealth sought to admit that O'Brien had a prior conviction for sexually assaulting two male children in 1982 and 1985. The trial court denied the motion on the basis that "the facts were insufficient to establish a 'signature[.]'" **Id.** at 970. We reversed, agreeing with the Commonwealth that the cases relied upon by the trial court were distinguishable. "In those cases, the relevance of that evidence was to be used to identify the perpetrator, while here the admission of the evidence of the prior crimes was relevant to establish a common scheme, plan or design and, thus, bolster the victim's credibility." **Id.**

**O'Brien** cited in support **Commonwealth v. Luktisch**, 680 A.2d 877(Pa. Super. 1996), which likewise involved sexual crimes against children. Luktisch was charged with raping his eleven-year-old stepdaughter. The trial court permitted the Commonwealth to introduce testimony from the victim's stepsister, who was Luktisch's biological daughter, regarding prior abuse. That witness was twenty-nine years old at the time of trial and testified that the abuse occurred when she was between 5 and 8 years old. **Id.** at 878. A second stepdaughter testified that she had also been abused by Luktisch.

On appeal, Luktisch argued that the evidence was too remote to qualify for admission "under the common scheme, plan, design or course of conduct exception…." *Id.* We disagreed, stating that the time gap "is inversely proportional to the similarity of the crimes in question." *Id.* at 879 (quoting *Commonwealth v. Miller*, 664 A.2d 1310, 1319 (Pa. 1995)). We determined that the abuse against all the victims was "nearly identical." *Id.* The "acts committed … were strikingly similar. The three victims were near the same age when Luktisch molested them; they all had the relationship of daughter or step[]daughter to Luktisch; all three were living with [Luktisch] when the acts occurred; and the nature of the acts were almost identical." *Id.* (quoting trial court opinion). While the case did not directly involve an analysis of whether the crimes qualified as a "signature," our conclusion that the crimes were "nearly identical" was conducted in terms of a common plan analysis. Thus, we accepted that the similarities of abuse warranted their admission.

Our decision in *Commonwealth v. Smith*, 635 A.2d 1086 (Pa. Super. 1993), also lends support as we again reversed the order of the trial court barring the Commonwealth from admitting Rule 404(b) evidence, concluding that the court abused its discretion. A ten-year-old girl, S.S., notified authorities that her father, James Smith, had sexually molested her on multiple occasions. The Pennsylvania State Police interviewed Smith's other two daughters, E.S. and M.N. E.S., who was then sixteen years old, stated that Smith abused her from age five through age ten. M.N., who was then twenty-seven, stated that Smith had abused her from age seven through

sixteen. The Commonwealth filed charges naming E.S. as the victim, and sought to introduce the testimony of S.S. and M.N. The trial court permitted S.S.'s testimony but barred M.N.'s, largely due to the passage of time. We reversed. "At first glance" we were inclined to agree with the remoteness analysis. *Id.* at 1089. However, we stated that remoteness is less important where "the details of each criminal incident are nearly identical," which was the case. *Id.* Describing the other act evidence as "strikingly similar," *id.* at 1090, we pointed out that the abuse of all three daughters started when the girls were quite young, and the abuse of M.N. ended right as E.S. turned five or six, when her abuse started. Thus, the remoteness was not dispositive and the allegations were sufficiently similar to justify their admission as a common plan.

Finally, in **Cosby**, **supra**, we agreed that "a criminal 'plan' may be analogized to a script or playbook of criminal tactics that worked for the offender when committing past crimes." **Cosby**, 224 A.3d at 402 (quoting Brief of the Office of the Attorney General of Pennsylvania as *Amicus Curiae*). "It is the pattern itself, and not the mere presence of some inconsistencies between the various assaults, that determines admissibility under these exceptions." *Id.*

These cases support the trial court's ruling, and we find no abuse of discretion. The "script" that Appellant followed was to exploit his position of trust placed in him as a babysitter, which sufficiently distinguishes this from a "common" sexual assault. **See Commonwealth v. Bidwell**, 195 A.3d 610,

618–19 (Pa. Super. 2018) ("Similarities cannot be confined to insignificant details that would likely be common elements regardless of the individual committing the crime."). We also agree with the trial court that additional facts serve to distinguish Appellant's circumstances from "common elements" of these crimes; namely, that Appellant knew the family members for a substantial period of time and that the abuse of all three victims commenced with Appellant's touching each victim's penis. While we agree with Appellant that the victims are dissimilar in that he did not share any kind of familial relationship with Z.G., the law does not require that all prior encounters be identical. "It is impossible for two incidents of sexual assault involving different victims to be identical in all respects." **Cosby**, 224 A.3d at 402.

That we found the trial courts abused their discretion in not admitting the evidence in **O'Brien** and **Smith** supports the trial court's ruling here. We do not imply the Commonwealth would have succeeded on appeal had the trial court denied its motion *in limine*. Rather, we observe that those cases, in finding the trial court abused its discretion in not allowing Rule 404(b) evidence, establishes that the court operated within the boundaries of its discretionary authority established by caselaw.

Finally, we acknowledge that our determination that the law does not require a strict degree of similarity implicates the criticisms raised by various Justices in the **Hicks** decision. It may be the case that a focused argument attacking Rule 404(b) precedents as departing from the common-law rules may one day succeed, and/or the Supreme Court may revisit the issue in a

- 19 -

manner favorable to Appellant's position. However, at present, the trial court did not abuse its discretion in following the authorities discussed.

Having concluded that the evidence was offered for a valid purpose that was not relevant only to establish propensity, we address whether the evidence should have been excluded due to its prejudicial impact. The foregoing cases likewise address this inquiry. We quote our **O'Brien** decision on this point:

> In [**Commonwealth v.**] **Gordon** [673 A.2d 866 (Pa. 1996)], the Commonwealth sought the admission of the defendant's conviction of similar crimes in its prosecution on two indecent assault charges. The Supreme Court found that the … prior conduct was relevant to prove, *inter alia*, a common scheme or plan and then discussed the prejudicial effect … as follows:
>
>> Whether relevant evidence is unduly prejudicial is a function in part of the degree to which it is necessary to prove the case of the opposing party. Here, the Commonwealth was required to prove that a non-consensual touching occurred, the purpose of which was sexual gratification. Gordon denies that the touching occurred, and since the uncorroborated testimony of the alleged victim in this case might reasonably lead a jury to determine that there was a reasonable doubt as to whether Gordon committed the crime charged, it is fair to conclude that the other crimes evidence is necessary for the prosecution of the case.
>>
>> Without doubt, the other crimes evidence would be prejudicial to Gordon. That is what it is designed to be. On the facts of this case, however, it is not unduly prejudicial, as it is required for the Commonwealth's case. It was an abuse of discretion for the trial court to deny the Commonwealth's motion for the admission of this evidence.
>
> **Id**. at 870 (footnote omitted).

**O'Brien**, 836 A.2d at 972.

We conclude that, on these facts, the admission of Z.G.'s accusations was not unduly prejudicial. As reflected by the discussion in **Gordon**, we must consider the value of the evidence in proving the Commonwealth's case, as child abuse cases typically occur behind closed doors and frequently lack corroboration.[6] This presents a close call, as we agree with Appellant that the fact the Commonwealth declined to charge Appellant for abusing Z.G. is a relevant consideration, suggesting that the Commonwealth may not have believed it could sustain a verdict beyond a reasonable doubt yet chose to introduce the evidence anyway. Because Z.G. testified and was made available for cross-examination, and his testimony if believed would support a verdict, it is not entirely clear why the Commonwealth declined to pursue charges. However, we recognize that there are many reasons why the Commonwealth would have declined prosecution. In any case, Z.G.'s accusations were just that: accusations. This was not a case where the Commonwealth introduced prior convictions. Additionally, the jury was instructed that the Z.G. testimony was offered for a limited purpose. TCO at

_____

[6] Then-Chief Justice Saylor's concurring opinion in **Hicks** argued that the doctrine of chances is a valid, non-propensity rationale, and discussed, *inter alia*, Professor Mark Cammack's article *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape: People v. Ewoldt Reconsidered*, 29 U.C. DAVIS. L. REV. 355 (1996). Therein, Professor Cammack observes that, "[b]ecause the probability that an innocent person will be falsely accused of child abuse or rape is low, evidence that a defendant on trial for one of those crimes has previously been accused of the same thing suggests that some force other than chance is at work in producing this improbable outcome." **Id.** at 357. While this theory was cited to establish a non-propensity rationale, its logic applies equally to this point.

13 (quoting jury instruction). We therefore find no abuse of discretion, and Appellant is not entitled to relief on this issue.

Appellant's second issue challenges the trial court's ruling permitting the Commonwealth to introduce hearsay under the TYHA. The trial court permitted the introduction of hearsay statements under the TYHA as to all three victims. However, Appellant's brief addresses only Z.G. and we therefore limit our discussion to that witness.

The TYHA permits the introduction of an "out-of-court statement made by a child victim or witness, who at the time the statement was made was 16 years of age or younger," describing certain offenses including the ones at issue herein, provided that the trial court "finds, in an *in camera* hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability[.]" 42 Pa.C.S § 5985.1(a)(1)(i-ii). "The statute requires 'indicia of reliability' which 'include, *inter alia*, the spontaneity of the statements, consistency in repetition, the mental state of the declarant, use of terms unexpected in children of that age, and the lack of a motive to fabricate.'" **Interest of D.C.**, 263 A.3d 326, 335 (Pa. Super. 2021) (quoting **Commonwealth v. Strafford**, 194 A.3d 168, 173 (Pa. Super. 2018)).

Referencing the testimony from T.T. that Z.G. disclosed the abuse in response to her questioning, Appellant claims that the statements lacked sufficient indicia of reliability because "at least a portion of the … testimony was tainted." Appellant's Brief at 14. Additionally, he argues that Z.G.'s

statements were not sufficiently reliable with respect to the factors listed in

***Strafford***:

> Addressing those factors, there is no spontaneity of statements. Z.G.['s] initial disclosure came after questioning by his mother after she met with a police officer at her residence. Further statements from Z.G. were [given] during a forensic interview, or during the competency hearing as noted *supra.* There is no consistency in the statements, except for the vague circular motion around the groin. Z.G. stated several times that he was not touched, and then it was "yes and no." Certainly, this is not any measure of consistency. There appeared to be no use of terms that would be unfamiliar to a child of Z.G.'s age. With respect to a motive to fabricate, counsel for … Appellant argues that indirectly [T.T.], Z.G.'s mother[,] had a motive to fabricate. Counsel argued that her testimony, wherein she admitted to lying, or "being less than truthful." [*sic*]. [T.T.] had pending felony charges at the time of her testimony. Appellant asserts she had a motive to get Z.G. to testify in a certain manner, in order to help in her own case.

***Id.*** at 16-17 (citation to transcript omitted).

The trial court's Rule 1925(a) opinion notes that Z.G. was examined *in camera* and cites "the opportunity to personally see, hear, and assess [Z.G.]" as supporting its determination that the statements bore sufficient indicia of reliability. TCO at 16. The court also cites the forensic interview, which it considered in finding adequate indicia of reliability.

We agree that the lack of spontaneity favors Appellant, as T.T. asked Z.G. whether Appellant had abused him. However, the other points either favor the Commonwealth or are effectively neutral. Beginning with the consistency of the statements, Z.G. consistently indicated that Appellant had touched him by making a circular motion around his groin. Appellant's

- 23 -

problem with this statement is not with its consistency but rather its lack of detail. However, Z.G. did state that he was touched, and that Appellant rubbed his private parts. Additionally, T.T. testified that Z.G. "remains afraid to talk about his contact" with Appellant. ***Id.*** at 5 (quoting transcript). The trial court observed the testimony of Z.G., including a recording of the forensic interview, and factored its firsthand observations of Z.G. into its decision. ***Cf. Commonwealth v. Dowling,*** 883 A.2d 570, 577 (Pa. 2005) (explaining that, in ruling on a witness' competency to testify, the trial court may rely "on criteria other than specifically-targeted questions, criteria such as the witness's demeanor, alertness, thoughtfulness, sincerity and general responses and testimony.").

Regarding T.T.'s felony charges, we do not agree that this supplies Z.G. with a motive to lie. It supplies a motive for why T.T. may have urged Z.G. to make disclosures, and Z.G. in turn may well have a motive to please his mother. Such matters ultimately go to the credibility of the witnesses. This is not a case where the child himself had an identifiable motive to lie on his own behalf, such as an ongoing custody dispute where there is evidence the child may have preferred one parent over another.

In addition, we note that the trial court reviewed the videotaped forensic interview and relied in part on that interview in making its ruling. "Based on my review of the mother's testimony and based on my review of the DVD, I think [there] was sufficient indicia of reliability to support out of court statements." N.T., 4/20/22, at 81. We agree that the forensic interview

- 24 -

process is a relevant consideration. In *Idaho v. Wright*, 497 U.S. 805 (1990), the United States Supreme Court addressed whether the admission of hearsay statements made by a child to a pediatrician examining the child for sexual assault violated the defendant's right to confront his accuser. The Court addressed whether the statements bore sufficient "particularized guarantees of trustworthiness" such that the evidence was admissible under *Ohio v. Roberts*, 448 U.S. 56 (1980), *abrogated by* *Crawford v. Washington*, 541 U.S. 36 (2004).[7] The courts had excluded the statements "in large measure because the statements resulted from an interview lacking certain procedural safeguards. The court below specifically noted that [the pediatrician] failed to record the interview on videotape, asked leading questions, and questioned the child with a preconceived idea of what she should be disclosing." *Wright*, 497 U.S. at 818. The United States Supreme Court stated, "**Although the procedural guidelines propounded by the court below may well enhance the reliability of out-of-court statements of children regarding sexual abuse**, we decline to read into the Confrontation Clause a preconceived and artificial litmus test for the procedural propriety of professional interviews…." *Id.* (emphasis added). Thus, the trial court was permitted to consider the reliability of the forensic

_____

[7] *Wright* deals with the Confrontation Clause, and as Z.G. was available for cross-examination, that legal concept is not at issue.

interview procedure in finding that the evidence was admissible under the TYHA.[8]

Finally, Appellant's third claim alleged that his sentence was illegal on the basis that he is required to register under the Sexual Offender Registration and Notification Act ("SORNA"), 42 Pa.C.S. §§ 9799.10-9799.42, for a period of life, which exceeds the otherwise allowable statutory maximum. In *Strafford*, *supra*, we rejected that claim:

> SORNA's registration requirements are an authorized punitive measure separate and apart from [the] term of incarceration. The legislature did not limit the authority of a court to impose registration requirements only within the maximum allowable term of incarceration; in fact, the legislature mandated the opposite and required courts to impose registration requirements in excess of the maximum allowable term of incarceration.

*Strafford*, 194 A.3d at 173.

Despite both parties citing *Strafford* elsewhere in their briefs with respect to the TYHA issue, neither Appellant nor the Commonwealth address that holding. Instead, Appellant's brief states: "Counsel raised this issue, albeit prematurely, wanting to preserve the right to appeal. This issue is still pending before the appellate courts in Pennsylvania. As such, counsel for … Appellant withdraws this issue from consideration." Appellant's Brief at 17. Appellant does not specify a case, and it is unclear whether he is seeking to

---

[8] In *Commonwealth v. Walter*, 93 A.3d 442 (Pa. 2014), our Supreme Court approvingly cited the *Wright* Court's "particularized guarantees of trustworthiness" standard in determining whether the "time, content and circumstances" of hearsay statements possessed "sufficient indicia of reliability" as demanded by the TYHA.

present a broader challenge to the legality of his sentence. We note that in *Commonwealth v. Thorne*, 276 A.3d 1192 (Pa. 2022), our Supreme Court held that a constitutional challenge to SORNA's lifetime period of registration based on an assertion that SORNA "effectively extends [the] maximum sentence without a jury's finding of future dangerousness in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000)," was not subject to waiver and remanded to this Court. We, in turn, remanded to the trial court for further factual development pursuant to *Commonwealth v. Torsilieri*, 232 A.3d 567 (Pa. 2020). *See Commonwealth v. Thorne*, 285 A.3d 908 (Pa. Super. filed Sept. 7, 2022).[9]

We are mindful that we "may address, and even raise *sua sponte*, challenges to the legality of an appellant's sentence even if the issue was not preserved in the trial court." *Commonwealth v. Armolt*, 294 A.3d 364, 376 (Pa. 2023). Thus, Appellant's decision to abandon the claim does not end the matter. However, in *Armolt*, the Court acknowledged that this does not obligate the courts to develop the claim for an appellant. "[R]egardless of whether a particular claim implicates the legality of a sentence, it is well settled that an appellant bears the burden of sufficiently developing his arguments to facilitate appellate review." *Id.* As Appellant has withdrawn this claim and offered no further advocacy, we will not develop an argument

---

[9] The 2020 *Torsilieri* decision remanded the case to the trial court for further development, and the Supreme Court heard oral argument on the case on May 23, 2023.

on his behalf. Additionally, the fact that ongoing litigation may touch on other aspects of his sentence calls for us to wait the resolution of those cases, which have benefited from advocacy devoted to their specific issues. We thus accept Appellant's withdrawal of any challenge to the legality of his sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/18/2023